**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**MOATH HAMZA AHMED AL-ALWI,**

*Petitioner/Plaintiff,*

**v.**

**Case No. 15-CV-681 (RJL)**

**BARACK H. OBAMA,** *et al,*

*Respondents/Defendants.*

<u>**PETITIONER'S OPPOSITION TO RESPONDENTS' MOTION TO DISMISS
PETITION FOR WRIT OF HABEAS CORPUS**</u>

**INTRODUCTION**

Pursuant to the Supreme Court's holding in *Hamdi v. Rumsfeld*, the United States' detention authority under the Authorization for Use of Military Force ("AUMF") expires when the relevant conflict giving rise to a prisoner's capture ends.  Operation Enduring Freedom, characterized by unilateral, U.S.-led combat operations, is the particular conflict in which Petitioner Moath al-Alwi ("Mr. al-Alwi") was captured fourteen years ago.  In light of the entire record, that conflict has ended and the United States is no longer engaged in *active* hostilities, fulfilling instead an advisory and supporting role in Afghanistan.

Under the banner of Operation Freedom's Sentinel, U.S. forces today have two limited missions in Afghanistan, both of which are in support of the Afghan National Defense & Security Forces ("Afghan security forces" or "ANDSF").  The first is to train, advise, and assist Afghan security forces, and the second is to conduct counterterrorism operations in support of those same Afghan forces, who are now in the lead and responsible for security in Afghanistan. This is in keeping with the 2014 Bilateral Security Agreement between Afghanistan and the United States ("Bilateral Security Agreement" or "Agreement"), which restricts U.S. military

activities in Afghanistan to a non-combat role, generally prohibits U.S.-led combat operations in Afghanistan, and specifically forbids unilateral counterterrorism operations.

While a security threat endures in Afghanistan today, it is now Afghanistan's fight. That the United States is there to play a supporting role cannot justify Mr. al-Alwi's continuing, open-ended detention in Cuba. The Court should deny the government's motion to dismiss and grant the writ of habeas corpus in this case. Now that the relevant conflict that led to his imprisonment has ended—and even if this Court were to find that conflict ongoing—Mr. al-Alwi's continued captivity is unlawful both as a matter of domestic and international law. He should finally be set free.

## BACKGROUND

### I.     The Relevant Armed Conflict in Afghanistan

In response to the September 11, 2001 attacks, Congress passed the Authorization for Use of Military Force, which empowered the President to:

> [U]se all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations, or persons.

Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2002) [hereinafter "AUMF"].

Pursuant to the AUMF, President George W. Bush launched Operation Enduring Freedom, which began with airstrikes against Taliban and al-Qaida forces in Afghanistan. President George W. Bush, *Presidential Address to the Nation*, The White House (Oct. 7, 2011).[1] Operation Enduring Freedom was the framework for the U.S. war effort in Afghanistan and its goals were to remove the Taliban regime from power and dismantle al-Qaida. *See 9/11*

---

[1] *Available at* http://georgewbush-whitehouse.archives.gov/news/releases/2001/10/20011007-8.html.

*Commission Report*, 337–38 (2004)[2] (describing the four phases of the Operation); *see also* Department of Defense Report on Enhancing Security & Stability in Afghanistan (June 2015) [hereinafter "DoD Report"], Resp'ts' Mot., Ex. 18 at 1, 4, ECF No. 15 (describing Operation Enduring Freedom and contrasting it with current U.S. advisory and support effort in Afghanistan); President Barack H. Obama, *Remarks by the President in a Press Conference*, The White House (Nov. 5, 2014) (stating that "the AUMF was designed to" respond to attacks of September 11, 2001).[3]

Between 2001 and 2011, the United States deployed more than half a million troops overall to Afghanistan to fulfill Operation Enduring Freedom's goals of overthrowing the Taliban regime and dismantling al-Qaida. *See Statement by the President on Ten Years of American Service in Afghanistan* (Oct. 7, 2011), Resp'ts' Mot., Ex. 5, ECF No. 15 (saluting "more than half a million men and women" who served in Afghanistan). At the peak of the conflict, the United States had 100,000 troops on the ground in Afghanistan. *Statement by the President on Afghanistan* (May 27, 2014) [hereinafter "May 2014 Statement"], Resp'ts' Mot., Ex. 9, ECF No. 15. In 2011, American forces were "heavily engaged in combat" and the United States and its coalition partners were based in over 800 sites throughout Afghanistan conducting active hostilities. Statement of General John F. Campbell, Commander United States Forces-Afghanistan, Before the House Armed Services Committee on the Situation in Afghanistan (March 4, 2015) [hereinafter "Campbell Statement"], Resp'ts' Mot., Ex. 17, ECF No. 15.

During Operation Enduring Freedom, the United States took a leadership role in counterterrorism and security operations in Afghanistan. *See, e.g.*, Letter from the President to the Speaker of the House, *Six Month Consolidated War Powers Resolution Report* (Dec. 11,

---

[2] *Available at* www.9-11commission.gov/report/911Report.pdf.

[3] *Available at* https://www.whitehouse.gov/the-press-office/2014/11/05/remarks-president-press-conference.

2014) [hereinafter "2014 WPR Report"], Resp'ts' Mot., Ex. 6 at 1–2, ECF No. 15 (reporting that U.S. armed forces led counterterrorism operations, which degraded al-Qaida and brought an end to Taliban rule in Afghanistan, with support from international partners); Intelligence Authorization Act, Pub. L. 112-87, § 414, 125 Stat. 1891 (2012) (Congressional finding that, after September 11, 2001 terrorist attacks, the United States led international coalition into Afghanistan to dismantle al-Qaida and deny them safe haven).  As a result, the United States sustained significant casualties in combat:

> During Operation Enduring Freedom, from October 2001 through December 2014, 2,215 U.S. military personnel died in Afghanistan; 20,027 U.S. military personnel were wounded-in-action (WIA), and 1,832 were killed-in-action (KIA).

DoD Report, Resp'ts' Mot., Ex. 18 at 29, ECF No. 15.

During Operation Enduring Freedom, the United States engaged in numerous combat operations and missions against Taliban, al-Qaida, and associated forces.  2014 WPR Report, Resp'ts' Mot., Ex. 6 at 1, ECF No. 15.  Operation Enduring Freedom, which spanned more than thirteen years, was not merely one mission in a long war in Afghanistan.  Operation Enduring Freedom *was* the war.  *See, e.g.*, *Statement by the President on the End of the Combat Mission in Afghanistan* (Dec. 28, 2014) [hereinafter "December 2014 Statement"], Resp'ts' Mot., Ex. 12, ECF No. 15 (equating the mission with the war in Afghanistan) ("Now, thanks to the extraordinary sacrifices of our men and women in uniform, our combat mission in Afghanistan is ending, and the longest war in American history is coming to a responsible conclusion."); *Statement by Secretary of Defense Chuck Hagel on Operation Enduring Freedom and Operation Freedom's Sentinel* (Dec. 28, 2014) [hereinafter "Secretary Hagel's Statement"], Resp'ts' Mot., Ex. 4, ECF No. 15 (announcing Operation Enduring Freedom's conclusion and referring to it as "America's longest war").

## II.     Mr. al-Alwi's Capture

Mr. al-Alwi was in northern Afghanistan on September 11, 2001.  Pet. ¶ 15.  After the United States launched its Operation Enduring Freedom bombing operations on October 7, 2001, Mr. al-Alwi fled for safety to Pakistan.  *Id.*  At that time, U.S. forces distributed flyers and notices throughout Pakistan and Afghanistan offering sizeable bounties in exchange for turning over "suspicious" persons.  *Id.*  This practice led to bounty hunters—often Pakistani government officials, residents, tribesmen, or militiamen—opportunistically capturing 689 individuals, many if not most on the basis of their Arab ethnicity.  Consequently, 369 of these individuals were delivered to the United States, many for $5,000 each, with little, if any, vetting, earning the Pakistani government millions of dollars in prize money.  *See* Mona Samari, *Bounties Paid for Terror Suspects*, Amnesty Int'l (Jan. 16, 2007);[4] Pervez Musharraf, *In the Line of Fire: A Memoir* 239–43 (Free Press 2006).

Ultimately, the United States took custody of Mr. al-Alwi, transported him back to Afghanistan, and finally rendered him to Guantánamo on January 16, 2002.  Mr. al-Alwi has been incarcerated there ever since.  Pet. ¶ 16.

## III.     The Armed Conflict Ends and a New Advisory Effort Begins

On June 22, 2011, President Obama announced the beginning of U.S. troop withdrawal from Afghanistan as part of a phased effort to wind down the United States' war effort in that country, framed from its outset by Operation Enduring Freedom.  *See Remarks by the President on the Way Forward in Afghanistan* (June 22, 2011), Resp'ts' Mot., Ex. 8 at 1, ECF No. 15 ("Our troops will continue coming home at a steady pace as Afghan security forces move into the lead.").  The President declared that the U.S. effort in Afghanistan will no longer be one of

---

[4] *Available at* http://www.amnesty.org.au/hrs/comments/2167/.

combat and that the war will "come to a responsible end." *Id.* at 1-2.  President Obama

emphasized that by 2014 "the Afghan people will be responsible for their own security." *Id.* at 1.

On March 25, 2013, the United States signed a Memorandum of Understanding ("MOU")

with the government of Afghanistan "under which the United States transferred all Afghan

nationals detained by U.S. forces in Afghanistan to the custody and control of the Afghan

government."  2014 WPR Report, Resp'ts' Mot., Ex. 6 at 1, ECF No. 15; *see also* Frank Jack

Daniel, *U.S. closes Bagram prison, says no more detainees in Afghanistan*, Reuters (Dec. 11,

2014).[5]

On May 27, 2014, President Obama announced that only 9,800 U.S. service members—

less than 10% of the U.S. force at the war's peak—would remain in Afghanistan after December

2014, and their presence would be in "an advisory role."[6]  May 2014 Statement, Resp'ts' Mot.,

Ex. 9 at 2, ECF No. 15.  The President reiterated that "America's combat mission will be over by

the end of this year" and remaining American troops would serve only "two narrow missions

after 2014: training Afghan forces and supporting counterterrorism operations against the

remnants of al Qaeda." *Id.*  President Obama emphasized that Afghan security forces have

"assumed the lead for combat operations." *Id.* at 1–2.

Crucially, the United States and Afghanistan signed a security agreement on September

30, 2014, ending approximately thirteen years of unilateral U.S. combat operations—or *active*

hostilities—under AUMF authority and defining the U.S. military's new advisory role in

Afghanistan.  *See generally Security and Defense Cooperation Agreement, U.S.-Afghanistan*

---

[5]      *Available         at         http://www.reuters.com/article/2014/12/11/us-usa-cia-torture-bagram-idUSKBN0JO2B720141211?nl=nytnow&em_pos=large&emc=edit_nn_20141211.*

[6] As of May, 2015, 6,827 of these troops have been assigned to training, advising, and assisting the ANDSF as part of NATO's Resolute Support ("RS").  DoD Report, Resp'ts' Mot., Ex. 18 at 20, ECF 15; *see also id.* at 19 ("The United States remains the largest force contributor to the RS mission.").

(Sept. 30, 2014) [hereinafter "Bilateral Security Agreement" or "BSA"], Resp'ts' Mot., Ex. 11, ECF No. 15.  President Obama described the Bilateral Security Agreement as "the necessary legal framework" for the United States' continuing presence in Afghanistan.  *Statement by the President on the Signing of the Bilateral Security Agreement and NATO Status of Forces Agreement in Afghanistan* (Sept. 30, 2014) [hereinafter "President's BSA Statement"], Resp'ts' Mot., Ex. 10, ECF No. 15; *see also* May 2014 Statement, Resp'ts' Mot., Ex. 9 at 2 ("This [Bilateral Security] Agreement is essential to give our troops the authorities they need to fulfill their mission, while respecting Afghan sovereignty."); BSA art. 2, ¶ 6 (declaring that Bilateral Security Agreement "provides the necessary authorizations for the presence and activities of United States forces in Afghanistan and defines the terms and conditions that describe that presence").  Recognizing Afghanistan's sovereignty and independence, the Bilateral Security Agreement provides that "United States forces shall not conduct combat operations in Afghanistan,"  BSA art. 2, ¶ 1, and may not engage in unilateral U.S. military counter-terrorism operations there.  *Id.* at ¶ 4.

In addition to limiting U.S. combat in Afghanistan to a supporting role for Afghan forces,[7] and emphasizing the Afghan security forces' leadership, the Bilateral Security Agreement provides that "United States forces shall not arrest or imprison Afghan nationals, nor maintain or operate detention facilities in Afghanistan."  BSA art. 3, ¶ 3.  Further recognizing Afghan sovereignty, the Bilateral Security Agreement requires U.S. authorities to remove members of the U.S. armed forces or civilian employees from Afghanistan upon request from Afghan authorities.  BSA art. 15, ¶ 3.

---

[7] Without any evidence in support, the government argues that the narrow exception of mutually agreed upon combat operations somehow swallows the Bilateral Security Agreement's clear rule that U.S. forces may not conduct such combat operations in Afghanistan.  The government cryptically refers to "existing arrangements," but offers no explanation of what those existing arrangements may be.

Following the signing of the Bilateral Security Agreement, President Obama announced the end of Operation Enduring Freedom, and declared that "the longest war in American history is coming to a responsible conclusion."  December 2014 Statement, Resp'ts' Mot., Ex. 12, ECF No. 15.   In line with the Bilateral Security Agreement, President Obama's announcement confirmed that the United States' "limited military presence in Afghanistan" was intended to support Afghan forces, at the invitation of the Afghan government.  *Id.*  While the President alluded to counterterrorism operations, he emphasized that the Afghan people have "take[n] the lead for their own security" and reiterated the United States' commitment to a "sovereign Afghanistan."  *Id.*  In addition, the President explained that the operations are residual as against "the remnants of al Qaeda."  *Id.*; *see also Remarks by the President at the National Defense University* (May 23, 2013), Resp'ts' Mot., Ex. 45, ECF 15 ("Core al-Qaeda is a shell of its former self . . . Osama bin Laden is dead, and so are most of his top lieutenants.").

On the same day that President Obama declared an end to Operation Enduring Freedom and the war in Afghanistan, and outlined the United States' Train, Advise, and Assist, and Counterterrorism missions, December 2014 Statement, Resp'ts' Mot., Ex. 12, ECF No. 15, then-Secretary of Defense Chuck Hagel announced that the new effort in Afghanistan would fulfill those two missions under the name "Operation Freedom's Sentinel."   Secretary Hagel's Statement, Resp'ts' Mot., Ex. 4, ECF No. 15.

In its June 2015 Report to Congress, the Department of Defense highlights restrictions on Operation Freedom's Sentinel's second mission, namely, supporting Afghan forces' counterterrorism operations.  Importantly, the DoD Report explains:

> U.S. forces no longer target individuals based on affiliation or association with any group other than al Qaeda […].  For example, U.S. forces no longer target individuals solely on the basis of their membership in the Taliban; however, if a member of the Taliban

> threatens U.S. or coalition forces, or provides direct support to al
> Qaeda, U.S. forces may take appropriate action.

DoD Report, Resp'ts' Mot., Ex. 18 at 9, ECF No. 15.  While "Afghanistan remains dangerous,"

*id.* at 34, it is the Afghan security forces that now "assume[] security responsibilities for all of

Afghanistan."  *Id.* at 9.

> Recently, President Obama announced the United States will maintain
>
>> [Its] current posture of 9,800 troops in Afghanistan through most
>> of the next year, 2016.  Their mission will not change.  Our troops
>> will continue to pursue those two narrow tasks . . . training Afghan
>> forces and going after al Qaeda.  But maintaining our current
>> posture through most of next year, rather than a more rapid
>> drawdown, will allow us to sustain our efforts to train and assist
>> Afghan forces as they grow stronger.

President Barack H. Obama, *Statement by the President on Afghanistan*, The White House (Oct.

15, 2015).[8]  In that same address, the President reiterated that "[l]ast December . . . America's

combat mission in Afghanistan came to a responsible end."  *Id.*  He stated: "Americans no longer

patrol Afghan villages or valleys.  Our troops are not engaged in major ground combat against

the Taliban.  Those missions now belong to the Afghans, who are fully responsible for securing

their country."  *Id.*  The troops remaining in Afghanistan exist "for continued support as Afghan

forces grow stronger" and, by the end of 2016, there will be only "5,500 troops at a small

number of bases."  *Id.*

> Since the end of Operation Enduring Freedom and the start of Operation Freedom's

Sentinel, "U.S. and coalition casualties have dropped significantly."  DoD Report, Resp'ts' Mot.,

Ex. 18 at 34, ECF No. 15.  As of May 31, 2015, "24 U.S. military personnel were [wounded-in-

action], and one was [killed-in-action] in Operation Freedom's Sentinel."  *Id.*  The lower U.S.

casualties in Afghanistan are in line with the conclusion of the relevant armed conflict and the

---

[8] *Available at* https://www.whitehouse.gov/the-press-office/2015/10/15/statement-president-afghanistan.

cessation of *active* U.S. hostilities there, which the United States began and led under the auspices of Operation Enduring Freedom.

## IV.     Procedural History

In 2005, Mr. al-Alwi challenged his imprisonment by filing a petition for the writ of habeas corpus through a next friend.  Following the Supreme Court's ruling in *Boumediene* that Guantánamo prisoners are entitled to prompt habeas corpus hearings, Mr. al-Alwi's petition moved forward in this Court.  The Court found no evidence of Mr. al-Alwi ever using arms against the United States or its coalition partners.  *Al Alwi v. Bush*, 593 F. Supp. 2d 24, 28 (D.D.C. 2008).  The Court nonetheless found that Mr. al-Alwi received some training at a Taliban-related camp, that he remained with a Taliban unit until after September 11, 2001, and that he stayed at guesthouses associated with the Taliban and, in a single instance, al-Qaida.  *See id.* at 29.  Based on these findings, the Court, quoting the legal standard defining the scope of detention authority, concluded that Mr. al-Alwi was lawfully detained because it was "more probable than not that he was 'part of or supporting Taliban or al-Qaeda forces' both prior to and after the initiation of U.S. hostilities in October 2001."  *Id.*  (*quoting Boumediene v. Bush*, 583 F. Supp. 2d 133, 135 (D.D.C. 2008)).  The court of appeals affirmed.  *Al Alwi v. Obama*, 653 F.3d 11, 18 (D.C. Cir. 2011), *cert. denied*, 132 S. Ct. 2739 (2012).

In the time since the Supreme Court's denial of *certiorari* of Mr. al-Alwi's first petition, new factual circumstances have developed, entitling Mr. al-Alwi to habeas corpus relief.

## STANDARD OF REVIEW

The government's motion seeks dismissal of the instant habeas corpus petition or judgment.  While the government did not bother to identify the applicable standard of review and it is unclear exactly what rule it invokes in favor of judgment, it does not matter because a

motion for judgment under Rule 12(c) is "functionally equivalent to a Rule 12(b)(6) motion." *Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 130 (D.C. Cir. 2012). Indeed, the standards of review for the two motions are "virtually identical." *Maniaci v. Georgetown Univ.*, 510 F. Supp. 2d 50, 58 (D.D.C. 2007) (*citing Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C. Cir. 1984)).

When considering a motion to dismiss, the Court "must accept all of the factual allegations contained in the complaint," *Atherton v. Dist. of Columbia Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (*quoting Erickson v. Pardus*, 551 U.S. 89, 91 (2007)), and "giv[e] [the pleader] the benefit of all inferences that can be derived from the facts alleged." *United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 119 (D.C. Cir. 2015). All petitions that state a "plausible claim for relief" shall survive the motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). That is, "[s]o long as the pleadings suggest a 'plausible' scenario to show the pleader is entitled to relief, a court may not dismiss." *Atherton*, 567 F.3d at 681 (*quoting Tooley v. Napolitano*, 556 F.3d 836, 839 (D.C. Cir. 2009)). Thus, "even if it strikes a savvy judge that recovery is very remote and unlikely," she "may not" grant the motion, so long as the petition states a plausible claim for relief. *Id.* (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

## ARGUMENT

The AUMF authorizes imprisonment only for the duration of a particular conflict in which a prisoner was captured. The conflict that led to Mr. al-Alwi's capture has ended and his continued imprisonment is unlawful. The government relies primarily on President Obama's recent statements to claim that the conflict continues. However, this Court need not defer to the President's determination on the question whether an armed conflict ended. Rather, the Court

should answer this question in light of the full record.  Specifically, the Court should assess whether the *relevant* conflict that led to Mr. al-Alwi's detention has ended, not whether the United States is involved in some way in Afghanistan today.

The relevant conflict that led to Mr. al-Alwi's capture and imprisonment was Operation Enduring Freedom, the framework for the United States' war in Afghanistan.  The government concedes that Operation Enduring Freedom has ended, it retains no detention authority in Afghanistan itself, yet it continues to claim the authority to imprison Mr. al-Alwi in Cuba.  The record shows that the relevant conflict consisting of U.S.-led combat missions has ended and that U.S. armed forces are currently in Afghanistan in an advisory role.  Indeed, the current effort in Afghanistan is a support effort that does not resemble Operation Enduring Freedom on any scale. The Court should thus find that the relevant conflict that led to Mr. al-Alwi's imprisonment has ended and his continued detention is unlawful.

## I.   THIS COURT MUST EXAMINE THE FULL RECORD TO DETERMINE WHETHER THE RELEVANT CONFLICT ENDURES

This Court need not defer to the Executive on whether the relevant armed conflict in Afghanistan continues to exist.  Such deference would both radically limit the Court's role in reviewing wartime prisoners' habeas petitions, and would stand in tension with the Supreme Court's holdings in *Hamdi*.

The legality of Mr. al-Alwi's ongoing imprisonment at Guantánamo turns on whether the relevant conflict that gave rise to that imprisonment is currently ongoing.  *See Hamdi v. Rumsfeld*, 542 U.S. 507, 521 (2004) (plurality opinion) ("Congress's grant of authority for the use of 'necessary and appropriate force' includes the authority to detain for the duration of the relevant conflict.").  This Court would be disabled from fair and thorough habeas review if it were to presume that the relevant conflict ends simply when the government says it ends.  *See id.*

at 537 ("Any process in which the Executive's factual assertions go wholly unchallenged or are simply presumed correct without any opportunity for the alleged combatant to demonstrate otherwise falls constitutionally short.").

Although the judiciary is traditionally "reluctant to intrude upon the authority of the executive in military and national security affairs," *Dep't of the Navy v. Egan*, 484 U.S. 518, 530 (1988), the Supreme Court in *Hamdi* held that:

> [A]s critical as the Government's interest may be in detaining those who actually pose an immediate threat to the national security of the United States during ongoing international conflict, history and common sense teach use that an unchecked system of detention carries the potential to become a means for oppression and abuse of others who do not present that sort of threat.

*Hamdi*, 542 U.S. at 530 (*citing Ex parte Milligan*, 4 Wall. 2, 125 (1866)).  Acknowledging the threat to liberty that such a condition poses, the Supreme Court went on to hold that detention pursuant to the AUMF turns on whether "the record establishes" that the relevant conflict giving rise to a petitioner's detention persists.  *Id.* at 521.  "Record" implies judicial review of the facts. *See Al Warafi v. Obama*, No. 09-2368, 2015 WL 4600420, at *3 (D.D.C. July 20, 2015) ("A 'record' implies a court, and though *Hamdi* does not explicitly say that the record in such cases must be reviewed . . . by a court rather than the Executive, no other reading makes sense.").

In *Al Warafi*, Judge Lamberth ruled that "the one constant in this history of habeas review has been *the independent power of a judge to assess the actions of the Executive*."  *Id.* (*quoting Al Bihani v. Obama*, 590 F.3d 866, 880 (D.C. Cir. 2010) (emphasis in original).  He concluded that "[b]y requiring that there be a record to review, and a court to review it, *Hamdi* 'appears to limit the President's authority to detain.'"  *Id.* (*quoting Hamdi* 542 U.S. at 588 (Thomas, J., dissenting)).

The government's citation to *Ludecke v. Watkins*, 335 U.S. 160, 169–70 (1948), for the proposition that a determination on whether a war has ended is a "matter[] for political judgment for which judges have neither technical competence nor official responsibility" is inapposite. Resp'ts' Mot. at 28.  *Ludecke* expressly left open the question of when it would be incumbent upon the judiciary to find that a war "had in fact ended."  *Ludecke*, 335 U.S. at 169.  Judge Lamberth found the answer to *Ludecke*'s open question in *Hamdi* and *Boumediene*: were the judiciary to "abstain from questions" regarding the continuing existence of a conflict, it would grant "the political branches . . . the power to switch the Constitution on or off at will." *Boumediene*, 553 U.S. at 765.  Thus, the determination regarding the ongoing existence of a given conflict cannot be left exclusively to the political branches because "even the war power does not remove constitutional limitations safeguarding essential liberties." *Al Warafi*, 2015 WL 4600420, at *8 (*quoting Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 426 (1934)).

The other cases that the government cites also do not bear on the one at hand.  For example, in *United States v. Anderson*, the Court deferred to a Presidential proclamation that the Civil War has ended for purposes of reviewing cases under the Abandoned or Captured Property Act, which allowed any person to reclaim property within two years of the war's end.  The Court found that "Congress did not intend to impose on this class of persons the necessity of deciding [the date] for themselves."  76 U.S. 56, 70-71 (1869).  In *The Protector*, which involved a similar statute of limitations as the one in *Anderson*, the Court relied on executive proclamations declaring the end of war only "in the absence of more certain criteria."  79 U.S. 700, 702 (1871). *The Three Friends* did not involve the question whether an armed conflict had ended, but rather asked whether the political branches recognized belligerency or political revolt in Cuba—in other words, "the existence of war in a material sense [or] of war in a legal sense."  166 U.S. 1,

14

62–64 (1897).  *Commercial Trust Co. of New Jersey v. Miller* addressed the question whether possession of property held in trust for an alien enemy is equivalent to physical seizure.  262 U.S. 51, 57 (1923).  And although the Supreme Court in *Baker v. Carr* decided that political branches determine the "dates of duration of hostilities," 369 U.S. 186 (1962), the Court also recognized that "deference rests on reason, not habit."  *Id.* at 213.  When "clearly definable criteria for decision may be available … the political question barrier falls away."  *Id.*

Finally, the government's use of *Maqaleh* is unavailing.  The issue before the *Maqaleh* court was whether it had jurisdiction to adjudicate habeas corpus petitions brought by prisoners held by the United States at Bagram Air Base in Afghanistan.  *Maqaleh v. Hagel*, 738 F.3d 317, 317 (D.C. Cir. 2013).  The petitioners in that case never contested the ongoing nature of the war in Afghanistan at the time.  *See* Jt. Br. for Pet'rs-Appellants at 13, *Al Maqaleh v. Obama*, Nos. 12-5404, 125399, 12-5401 (D.C. Cir. Apr. 27, 2013) (conceding "Bagram's location within a theatre of war").  As a result, the issue whether the existence *vel non* of ongoing conflict is a political question was never presented to the court of appeals.[9]

"[U]nless Congress acts to suspend it, the Great Writ of habeas corpus allows the Judicial Branch to play a necessary role in maintaining this delicate balance of governance, serving as an important judicial check on the Executive's discretion in the realm of detentions."  *Hamdi*, 542 U.S. at 536 (*citing INS v. St. Cyr*, 533 U.S. 289, 301 (2001)).  Mr. al-Alwi's petition must be heard.

---

[9] In their motion to dismiss, Respondents contend that Mr. al-Alwi "does not dispute" that "determinations concerning the end of hostilities are reserved for the political branches."  Resp'ts' Mot. 31.  This characterization misunderstands Mr. al-Alwi's argument.  Although the petition for habeas corpus reprises statements from the President and Secretary of Defense, it presents those as evidence of the conflict's end.  Nowhere does Mr. al-Alwi concede or imply that the Court is limited to examination of that evidence without more.  Ultimately, as the Petition and this Opposition make clear, this Court has the authority to determine if the relevant conflict has ended as a matter of law and fact based on its examination of the full record.

## II.    THE CONFLICT THAT LED TO MR. AL-ALWI'S IMPRISONMENT HAS ENDED

The relevant conflict in which Mr. al-Alwi was captured, one framed by Operation Enduring Freedom, has ended.   Notwithstanding current U.S. military involvement in Afghanistan, his continued imprisonment is now unlawful.

In *Hamdi,* the Supreme Court held that AUMF authority permitting the Executive to use "necessary and appropriate force" against the Taliban, al-Qaida, and associated forces includes the authority to detain.  542 U.S. at 521.  The *Hamdi* Court stressed that the AUMF does not authorize indefinite detention.  *See* 542 U.S. at 521 ("[W]e agree that indefinite detention for the purpose of interrogation is not authorized.").  Rather, the Court held that detention is lawful under the AUMF only "for the duration of the particular conflict in which [the prisoner was] captured."  542 U.S. at 518.  Indeed, as Justice Kennedy observed in *Rasul*:

> Perhaps, where detainees are taken from a zone of hostilities, detention without proceedings or trial would be justified by military necessity for a matter of weeks; but as the period of detention stretches from months to years, the case for continued detention to meet military exigencies becomes weaker.

*Rasul v. Bush*, 542 U.S. 466, 488 (2004) (Kennedy, J., concurring); *see also al Odah v. Obama*, 62 F. Supp. 3d 101, 113 (D.D.C. 2014) (stating that "a court's determination of al-Qaeda membership does not justify a 'lifetime detention'").  Certainly, as *Hamdi* holds, when the "relevant conflict" has ended as it has here, 542 U.S. at 521, the case for continued detention expires with it.

Of course, *Hamdi*'s assessment of whether the "relevant conflict" endures was informed by Article 118 of the Third Geneva Convention.  *See Hamdi*, 542 U.S. at 520 ("It is a clearly established principle of the law of war that detention may last no longer than active hostilities" (*citing* Article 118 of the Geneva Convention (III) Relative to the Treatment of Prisoners of War

[hereinafter "Third Geneva Convention"], Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135)).  But the reference to "*active* hostilities" in Article 118 was not intended to require absolute peace between two parties to an armed conflict before mandating the release of prisoners of war. Rather, the phrase "active hostilities" is a term of art that contemplates the possibility that some conflict might continue after the better part of fighting has subsided.  In explaining the proper interpretation of the Convention, the Commentary to the Third Geneva Convention states that "captivity is a painful situation which must be ended as soon as possible," and that "prisoners of war should not be retained in captivity on various pretexts."[10]  J. Pictet, et al., Int'l Comm. of Red Cross, *Commentary to the Geneva Convention (III) Relative to the Treatment of Prisoners of War* 546 (1960) [hereinafter "Third Convention Commentary"].[11]

Unlike Article 118 to the Third Geneva Convention, Article 133 of the Fourth Geneva Convention states that "[i]nternment shall cease as soon as possible after *the close of hostilities*." Fourth Geneva Convention art. 133 (emphasis added).  The Commentary to this particular convention acknowledges the reality that hostilities may continue to occur even after active combat has ended: "[T]his does not mean . . . that internment can always be brought to an end shortly after the end of active hostilities . . . The disorganization caused by war may quite possibly involve some delay before the return to normal."  J. Pictet, et al., Int'l Comm. of Red Cross, *Commentary to the Geneva Convention (IV) Relative to the Protection of Civilian Persons*

---

[10] The Commentaries to the Geneva Convention are not part of the Conventions themselves, and therefore have not been ratified by Congress or the President.  Nevertheless, the Commentaries provide helpful context for understanding the Conventions because they were drafted by staff members of the International Red Cross who worked on the revision of the Conventions.  Indeed, the Supreme Court has previously cited to the Third Convention Commentary when considering the applicability of the Geneva Conventions to Guantánamo prisoners.  *See Hamdan v. Rumsfeld*, 548 U.S. 557, 631 (2006) ("[T]he commentaries also make clear that the scope of application of [Common Article 3] must be as wide as possible." (*quoting* Third Convention Commentary at 36)).

[11] *Available at* https://www.loc.gov/rr/frd/Military_Law/pdf/GC_1949-III.pdf.

*in Time of War* 515 (1960) [hereinafter "Fourth Convention Commentary"].[12]   No such qualification as to the "delay before the return to normal" exists in the text of Article 118 or its Commentary.  *See* Third Geneva Convention art. 118; Third Convention Commentary at 540–53. Clearly then, Article 133 differentiates the requirement to release civilian prisoners from the requirement to release war captives such as Mr. al-Alwi by establishing the term "close of hostilities" as a point in time that may occur after the "cessation of active hostilities."  *See* Fourth Convention Commentary at 514–15; *see also Hamdan*, 548 U.S. at 578.

The relevant conflict in which Mr. al-Alwi was captured was Operation Enduring Freedom, the framework for the U.S.-led war in Afghanistan, consisting of U.S.-led combat missions pursuant to AUMF authority.  During Operation Enduring Freedom, the United States deployed hundreds of thousands of troops to Afghanistan, and casualties reached significant levels.  As part of Operation Enduring Freedom, the United States engaged in unilateral combat operations—or *active* hostilities—against the Taliban and al-Qaida, and targeted individuals based on their membership in either group.

In contrast, the current U.S. effort in Afghanistan under the banner of Operation Freedom's Sentinel is limited to U.S. training and assistance for Afghan security forces, and support for Afghan-led counterterrorism missions.  The United States is no longer acting unilaterally in Afghanistan as it was during Operation Enduring Freedom where it led combat missions and engaged in active hostilities pursuant to its authority derived from the AUMF. Today, the Bilateral Security Agreement between the United States and Afghanistan strictly constrains all U.S. military activities in Afghanistan.  As President Obama has stated on more than one occasion, that agreement now provides "the legal framework" for U.S. involvement in the current conflict between the Government of Afghanistan and its adversaries in Afghanistan.

---

[12] *Available at* https://www.loc.gov/rr/frd/Military_Law/pdf/GC_1949-IV.pdf.

President's BSA Statement, Resp'ts' Mot., Ex. 10, ECF No. 15; *see also* May 2014 Statement, Resp'ts' Mot., Ex. 9, ECF No. 15 (declaring that BSA gives U.S. troops the authorities they need to fulfill their missions while respecting Afghan sovereignty).  The number of U.S. troops in Afghanistan is less than one-tenth what it was at Operation Enduring Freedom's peak, and casualties have dropped dramatically.  *See* May 2014 Statement, Resp'ts' Mot., Ex. 9 at 2, ECF No. 15.  The United States no longer engages in unilateral combat operations against the Taliban or al-Qaida, no longer wields any wartime detention authority inside Afghanistan, and generally no longer targets individuals based on their affiliation or membership with the Taliban.  DoD Report, Resp'ts' Mot., Ex. 18 at 9, ECF No. 15.  Since the particular conflict in which Mr. al-Alwi was captured has ended, his continued imprisonment is unlawful.

### A.  Unlike Operation Enduring Freedom, the Current U.S. Effort in Afghanistan Is Constrained by the Bilateral Security Agreement

During Operation Enduring Freedom, the United States led many unilateral combat missions under AUMF authority.  *See Remarks by the President in a Press Conference*, *supra* ("In 2001, after the heartbreaking tragedy of 9/11, we had a very specific set of missions that we had to conduct, and the AUMF was designed to pursue those missions."); *see also* AUMF § 2(a) (authorizing "necessary and appropriate force" against those responsible for the September 11, 2001, attacks).  In contrast, U.S. forces are now generally prohibited from conducting combat operations in Afghanistan, and specifically may not conduct unilateral combat operations there.  BSA art. 2, ¶¶ 1, 4.

When the United States and Afghanistan executed the Bilateral Security Agreement and President Obama announced the end of Operation Enduring Freedom, the controlling legal framework for U.S. involvement in Afghanistan became that Agreement.  The President stated that "[the Agreement] provides our military service members the necessary legal framework to

carry out two critical missions after 2014."  President's BSA Statement, Resp'ts' Mot., Ex. 10, ECF No. 15.  The relevant conflict giving rise to Mr. al-Alwi's capture was characterized by unilateral U.S. military action in Afghanistan—in other words, *active* hostilities.  In contrast, the Bilateral Security Agreement drastically constrains the United States' current, reduced involvement in Afghanistan and limits U.S. military activity to an advisory and supportive role.

In line with the Bilateral Security Agreement, the United States is currently pursuing two missions in Afghanistan.  The first is training, advising, and assisting the Afghan National Defense and Security Forces.  The second is supporting Afghan forces' counterterrorism operations.  Indeed, the Afghan security forces are now fully "responsible for securing the people and territory of Afghanistan."  BSA art. 2, ¶ 3; *see also id.* ¶ 2 ("[T]he United States shall undertake supporting activities, as may be agreed.").

The Bilateral Security Agreement between the United States and Afghanistan provides that the "United States forces shall not conduct combat operations in Afghanistan."  BSA, art. 2, ¶ 1.  While the Bilateral Security Agreement permits U.S. forces to support Afghan forces in counterterrorism combat operations, the Agreement also specifically prohibits the U.S. military from conducting unilateral counterterrorism operations:

> The Parties agree to continue their close cooperation and coordination toward [defeating al-Qaida and its affiliates], with the intention of protecting U.S. and Afghan national interests without unilateral U.S. military counter-terrorism operations.

BSA art. 2, ¶ 4.  The Bilateral Security Agreement further constrains U.S. counterterrorism operations in Afghanistan as follows:

> U.S. military counterterrorism operations are intended to complement and support ANDSF's counterterrorism operations, with the goal of maintaining ANDSF lead, and with full respect for Afghan sovereignty and full regard for the safety and security of the Afghan people, including in their homes.

*Id.*   Under the Agreement, therefore, the United States is prohibited from engaging in both unilateral combat and counterterrorism operations.

The United States is no longer in a combat role in Afghanistan.   *Remarks by the President in a Press Conference*, *supra*.   Rather, U.S. forces simply "support[] counterterrorism operations against the remnants of al Qaeda."   May 2014 Statement, Resp'ts' Mot., Ex. 9 at 2, ECF No. 15.[13]   Further establishing that the U.S. combat role has ended in Afghanistan, the United States handed over custody of Afghan nationals to the Afghan government as early as March 2013, as the phased drawdown of the U.S.-led war and of active hostilities commenced. 2014 WPR Report, Resp'ts' Mot., Ex. 6 at 1, ECF No. 15.   Today, the United States wields no wartime detention authority inside Afghanistan, as the Bilateral Security Agreement provides that "United States forces shall not arrest or imprison Afghan nationals, nor maintain or operate detention facilities in Afghanistan."   BSA art. 3, ¶ 3.   Indeed, shortly after executing the Bilateral Security Agreement, the United States officially turned over exclusive control of the Bagram prison to the Afghan government.   *See U.S. closes Bagram prison, says no more detainees in Afghanistan*, *supra*.   Against that backdrop, it defies understanding that the government would nonetheless cling to its asserted authority to continue to detain Mr. al-Alwi in Cuba.

While the United States continues to support Afghan forces in military operations, it no longer exhibits the trappings of a party leading unilateral, *active* hostilities inside Afghanistan. Its power to imprison Mr. al-Alwi was incident to the particular conflict that led to his capture, Operation Enduring Freedom.   Under the Bilateral Security Agreement, the United States would

---

[13] U.S. Secretary of Defense Ashton B. Carter has pointed to sporadic U.S. military action in other countries and affirmed that such action "doesn't represent us entering the combat role."   Krishnadev Calamur, *U.S. Direct Action Against the Islamic State*, The Atlantic, October 27, 2015, *available at* http://www.theatlantic.com/international/archive/2015/10/carter-syria-iraq-isis/412681/.

be unable to imprison Mr. al-Alwi inside Afghanistan today.  The current U.S. effort in

Afghanistan is one of support for the Afghan people in *their* fight.

## B.  The Particular Conflict that Gave Rise to Mr. al-Alwi's Imprisonment Differed Materially from the Current Support Effort in Afghanistan

The United States' involvement in Afghanistan today does not resemble the war it led

under the auspices of Operation Enduring Freedom.  The characteristics of that conflict—in

connection with which Mr. al-Alwi was captured—differ starkly from those that define the

current engagement in Afghanistan.  Courts have looked to several factors when determining

whether armed conflict has ended, including:

> [T]he length, duration, and intensity of the hostilities between the
> parties, whether there was protracted armed violence between the
> governmental authorities and organized armed groups; whether
> and when the United States decided to employ the combat
> capabilities of its armed forces to meet the al Qaeda threat; the
> number of persons killed or wounded on each side; . . .statements
> of the leaders of either side indicating their perceptions regarding
> the existence of an armed conflict . . . and any other facts and
> circumstances . . . relevant.

*United States v. Al Bahlul*, 820 F. Supp. 2d 1141, 1190 (U.S.C.M.C.R. 2011), *vacated on other*

*grounds sub nom. Al Bahlul v. United States*, 792 F.3d 1 (D.C. Cir. 2015).[14]

Upon consideration of the record, it should be apparent to this Court that Operation

Enduring Freedom's end, followed by Operation Freedom's Sentinel's beginning, present a

break in the "relevant conflict," such that the AUMF no longer authorizes Mr. al-Alwi's

imprisonment.  As detailed above, the United States engaged in unilateral combat missions

during Operation Enduring Freedom under AUMF authority.  Conversely, the Bilateral Security

Agreement provides that "U.S. forces shall not conduct combat operations in Afghanistan," BSA

---

[14] While the U.S. Court of Military Commission Review is not an Article III court, its decisions are nevertheless
reviewable by Article III courts—the D.C. Circuit and the U.S. Supreme Court.  *See* 10 U.S.C. § 950g(a).  The court
generated these factors as it weighed whether the defendant's conduct violated the Military Commissions Act of
2006.  *Al Bahlul*, 820 F. Supp. 2d at 1190.

art. 2, ¶ 1, and expressly prohibits all "unilateral U.S. military counter-terrorism operations" there.  BSA art. 2, ¶ 4.  While that alone demonstrates that the "relevant conflict" that led to Mr. al-Alwi's imprisonment has ended, application of the *Al Bahlul* factors further bolsters that conclusion.

An examination of the number of troops deployed and casualties registered in Afghanistan reveals that the current U.S. military engagement in support of the Government of Afghanistan under Operation Freedom's Sentinel does not approach the figures seen during the U.S.-led war.  There were more than 100,000 U.S. troops deployed in Afghanistan at Operation Enduring Freedom's peak.  Currently, approximately one tenth of that number remains, and the United States intends to further draw down its military presence.  Casualties during the war reached a peak level that is unlikely to be reached during Operation Freedom's Sentinel.  Specifically, 20,027 U.S. military personnel were wounded-in-action (WIA), and 1,832 were killed-in-action (KIA) during Operation Enduring Freedom.  DoD Report, Resp'ts' Mot., Ex. 18 at 29, ECF No. 15.  Under the banner of Operation Freedom's Sentinel, as of May 15, 2015, one member of the U.S. armed forces has been killed-in-action, and 24 have been wounded-in-action. *Id.* at 34.

President Obama has attributed this drop in casualties to the conclusion of the United States' combat role in Afghanistan.  *See Remarks by President Obama and President Ghani of Afghanistan in Joint Press Conference* (Mar. 24, 2015), Resp'ts' Mot., Ex. 19 at 4, ECF No. 15 ("Casualties have come down precipitously … .  That has occurred precisely because we're not in a combat role.").  President Obama noted that Afghan security forces now bear the brunt of the fighting and have experienced "significant casualties."  *Id.* ("As we've drawn down, [the Afghan security forces] stood up, and they're fighting.").

With respect to the "al-Qaeda threat," *Al Bahlul*, 820 F. Supp. 2d at 1190, the Bilateral Security Agreement prohibits the United States from engaging in unilateral counterterrorism operations.  BSA art. 2, ¶ 4.  Even if the United States is currently engaged in residual fighting against the remnants of al-Qaida and Taliban pursuant to the constraints of the Agreement, it is the Afghan security forces that have taken the lead on counterterrorism operations.

The current involvement in Afghanistan is not a continuation of the U.S. war in that country, but a support mission for the Afghan forces against the threats they are facing.  Indeed, a significant security threat from the Taliban and al-Qaida may exist for decades to come, but that fight now primarily belongs to the Government of Afghanistan.  The President confirmed as much when he discussed temporarily maintaining the current number of troops in Afghanistan:

> [The troops'] mission will not change.  Our troops will continue to pursue those two narrow tasks . . . training Afghan forces and going after al Qaeda.  But maintaining our current posture through most of next year, rather than a more rapid drawdown, will allow us to sustain our efforts to train and assist Afghan forces as they grow stronger.

President Barack H. Obama, *Statement by the President on Afghanistan*, *supra*.  Thus, although the President has paused the drawdown, the current, limited mission of U.S. troops in Afghanistan remains unchanged—to train, assist, and advise the Afghan military, and engage in coordinated counterterrorism efforts with Afghan consent.

A final relevant factor enumerated in *Al Bahlul* deserves mention: statements from the President regarding the existence of armed conflict.  *Al Bahlul*, 820 F. Supp. 2d at 1190. Throughout its motion, the government mischaracterizes Mr. al-Alwi's argument.  Petitioner's position in this case is not "that earlier statements by the President constitute the requisite determination" without more.  Resp'ts' Mot. 3.  Rather, the President's statements—including his refrain to the American people that "America's combat mission in Afghanistan came to a

reasonable end," President Barack H. Obama, *Statement by the President on Afghanistan*, *supra*—feature among various evidentiary elements in the record that this Court must consider holistically as it assesses whether the relevant conflict has ended.

In light of the considerations above, the present U.S. support effort in Afghanistan differs far too greatly from the specific conflict that gave rise to Mr. al-Alwi's imprisonment to justify his continued imprisonment.

### C. The United States No Longer Targets Taliban Members

While this Court found Mr. al-Alwi to be part of a Taliban unit,[15] the United States no longer actively targets individuals based on their affiliation with the Taliban, except in self-defense or where the individual provides direct support to al-Qaida.  DoD Report, Resp'ts' Mot., Ex. 18 at 9, ECF No. 15.  Adjudicating Mr. al-Alwi's first habeas corpus petition, this Court held that Mr. al-Alwi "stay[ed] at certain guesthouses in Pakistan and Afghanistan … [that] were closely associated with the Taliban and that one guesthouse had connections with al Qaeda," that Mr. al-Alwi received some training at a "Taliban-related camp and thereafter traveled to two different fronts over the following year to support Taliban fighting forces," and that Mr. al-Alwi "remained with his Taliban unit well after September 11, 2001."  *Al Alwi v. Bush*, 593 F. Supp. 2d 24, 28 (D.D.C. 2008).  The D.C. Circuit affirmed.  *Al Alwi v. Obama*, 653 F.3d 11, 18 (D.C. Cir. 2011).  Neither this Court nor the court of appeals relied upon the utterly unsubstantiated allegations that Mr. al-Alwi served as Osama bin Laden's bodyguard or received any training at an al-Qaida training camp.  *Id.* at 14 n.3.[16]

---

[15] Without conceding the accuracy of this Court's prior factual findings, in the instant action, Mr. al-Alwi does not seek to re-litigate those findings.

[16] The government's allegations regarding Mr. al-Alwi's supposed connection with al-Qaida were laughably thin and, ultimately, were not relied on by this Court.  *See, e.g.,* Br. for Appellant at 8–11, *Al Alwi v. Obama*, No. 09-5125 (D.C. Cir. Aug. 9, 2010).  In its instant Motion, the government cavalierly asks the Court to stay its hand, if it were inclined to rule for Mr. al-Alwi, and to instead give the government yet another opportunity to reframe its case.

A prisoner must be released when the particular conflict in which he was captured ends.[17]

*Hamdi*, 542 U.S. 518.  The United States routinely engaged in unilateral combat missions against

the Taliban during the war framed by Operation Enduring Freedom but, in its current posture in

Afghanistan, it generally "no longer target[s] individuals solely on the basis of their membership

in the Taliban."  DoD Report, Resp'ts' Mot., Ex. 18 at 9, ECF No. 15.  While the D.C. Circuit

found that "release is only required when the fighting stops," *Al Bihani v. Obama*, 590 F.3d 866,

874 (D.C. Cir. 2010), that case must be read consistently with *Hamdi*.  The "fighting" *Al Bihani*

refers to is fighting that occurs during the "relevant conflict" that gave rise to imprisonment, not

just *any* fighting taking place in Afghanistan.  The United States retains a degree of military

involvement in Afghanistan subject to the constraints of the Bilateral Security Agreement, but

Afghan forces are now leading the fight.  *See* BSA art. 2, ¶ 4 (highlighting the "goal of

maintaining ANDSF lead"); *see also* May 2014 Statement, Resp'ts' Mot., Ex. 9 at 2, ECF No. 15

(characterizing the counterterrorism mission as a support effort against "the remnants of al

Qaeda").  While Taliban, al-Qaida, and other forces may pose a threat in Afghanistan for some

time to come, that is now primarily the Government of Afghanistan's fight.  Current U.S. support

for Afghanistan's fight cannot justify Mr. al-Alwi's continued detention.

### D.  The Cases Respondents Cite Are Inapposite

Finally, *Al-Bihani*, *Al Kandari*, and *Al Warafi* cannot bear the weight of the government's

assertion that the particular conflict that led to Mr. al-Alwi's imprisonment endures.  The factual

---

Resp'ts' Mot. at 39 n. 19.  The government offers absolutely no reason in law, logic, or equity why it should be given a second bite at the apple.  The Court should not accede to that shocking request.  Mr. al-Alwi has been in U.S. custody at Guantánamo since 2002 and "the costs of delay can no longer be borne by those who are held in custody."  *Boumediene v. Bush*, 553 U.S. 723, 795 (2008).

[17] While the D.C. Circuit found that "release is only required when the fighting stops," *Al Bihani v. Obama*, 590 F.3d 866, 874 (D.C. Cir. 2010), *Al Bihani* must be read consistently with *Hamdi*.  The "fighting" referred to in *Al Bihani* must be read to mean fighting that occurs during the "relevant conflict" that gave rise to imprisonment, not just any fighting.

record before this Court differs dramatically from that presented in *Al-Bihani* back in 2010.  The

figures at that time, current as of October 22, 2009, were 34,800 U.S. troops and 71,030 total

coalition troops present in Afghanistan.  *Al-Bihani v. Obama*, 590 F.3d 866, 874 (D.C. Cir.

2010).  As noted above, the situation in Afghanistan today has changed dramatically, now that

the relevant conflict framed by Operation Enduring Freedom has ended and that the current U.S.

military involvement in Afghanistan is constrained by the Bilateral Security Agreement.  This

Court must make its own determination as to whether the relevant conflict persists in 2015 based

on the facts now before it.

The government's reliance on *Al Warafi* and *Al Kandari* is also unavailing because the

petitioners there argued "that recent statements by the President conclusively prove that the

hostilities that justified his detention, those between the United States and Taliban, have ended."

*Al Warafi v. Obama*, No. 09-2368, 2015 WL 4600420, at *1 (D.D.C. July 30, 2015); *see also Al*

*Kandari v. United States*, 15-CV-329 (CKK), Classified Memorandum Opinion (D.D.C. Aug.

31, 2015), Resp'ts' Mot., Ex. 1 at 8, ECF No. 15 ("Here the parties dispute whether Petitioner's

detention is lawful, both arguing that the President's and / or other government officials'

statements regarding the status of the relevant conflict support their respective positions.").  This

case differs from those earlier cases because Mr. al-Alwi does not rely on the President's

statements as legally conclusive that the war in Afghanistan is over.  Instead, the President's

statements are but one factor among many informing the conclusion that the United States is no

longer engaged in *active* hostilities and is no longer prosecuting the particular conflict that gave

rise to Mr. al-Alwi's imprisonment.

As detailed above, other factors also evidence a cessation of the relevant conflict,

including the U.S. military's transition from an active combat mission to one of support, the

execution of the Bilateral Security Agreement, the expiration of U.S. detention authority inside

Afghanistan, and the significant decrease in troop levels.  Taken together, these factors form the

factual basis for Mr. al-Alwi's claim that the United States has ended the relevant conflict, a

basis which is wholly different from the petitioner's reliance on the President's words alone in *Al*

*Warafi*.  *See Al Warafi*, 2015 WL 4600420, at *7 (quoting petitioner's motion, which argued that

the President's statements were "a conclusive, unreviewable determination of the end of combat

for purposes of detaining prisoners captured in the war in Afghanistan against the Taliban").

### III.   EVEN WERE THIS COURT TO DETERMINE THAT THE RELEVANT CONFLICT ENDURES, MR. AL-ALWI'S INDEFINITE IMPRISONMENT IS UNLAWFUL

Writing for the plurality in *Hamdi*, Justice O'Connor anticipated the possibility of a

conflict so unlike previous conflicts that conventional law of war principles governing wartime

detention would no longer apply.

> [W]e understand Congress' grant of authority for the use of "necessary and appropriate force" to include authority to detain for the duration of the relevant conflict, and our understanding is based on longstanding law-of-war principles.  If the practical circumstances of a given conflict are entirely unlike those of the conflicts that informed the development of the law of war, that understanding may unravel.

*Hamdi*, 542 U.S. at 521.

Were this Court inclined to find that the conflict leading to Mr. al-Alwi's capture and

imprisonment is ongoing, then, in the alternative, Mr. al-Alwi respectfully suggests that, after

fourteen years, the scenario Justice O'Connor described has come to pass and conventional

understandings of longstanding principles—including the authority to detain for the duration of

the conflict—have unraveled.  Lifetime imprisonment was simply never contemplated by the

framers of the Geneva Conventions.  At this stage, therefore, the Court should set Mr. al-Alwi free.

## IV.  MR. AL-ALWI RETAINS HIS RIGHTS UNDER CUSTOMARY INTERNATIONAL LAW

Mr. al-Alwi does not directly invoke the Geneva Conventions or its protocols in these habeas proceedings, which renders the provisions of the Military Commissions Act that the government cites, Resp'ts' Mot. 42, irrelevant here.  Rather, Mr. al-Alwi retains and invokes his rights under the norms enshrined in customary international law, which include Article 75 of Additional Protocol I to the Geneva Conventions.  Pet. ¶¶ 38–44.  The government concedes that "the United States has chosen … to treat the principles set forth in Article 75 as applicable to any individual it detains in an *international armed conflict*."  Resp'ts' Mot. 40 (emphasis in the original).  The government contends, however, that "the conflict at issue here" is a non-international armed conflict.  *Id.*

The government is incorrect.  Mr. al-Alwi was captured during an international armed conflict and retains all of the protections afforded by customary international law to prisoners of his condition.  Indeed, even on January 16, 2002, the date that Mr. al-Alwi was finally rendered to Guantánamo, Pet. ¶ 2, an international armed conflict raged on in Afghanistan.

The government itself has acknowledged that the United States still characterized the conflict at that point in time as an international armed conflict.  Resp'ts' Opp'n to Mot. to Compel Mixed Med. Comm'n at 28, *Aamer v. Obama*, No. 04-cv-2215 (D.D.C. July 2, 2015); *see also*, *News Release: Geneva Convention on prisoners of war*, Int'l Comm. of the Red Cross (Feb. 9, 2002) (welcoming "the United States' reaffirmation of the applicability of the Third Geneva Convention to the international armed conflict in Afghanistan").[18]

---

[18] Available at https://www.icrc.org/eng/resources/documents/misc/57jrm3.htm.

There is also no dearth of authoritative commentary confirming this characterization of the conflict at that historical juncture. *See, e.g.,* Françoise J. Hampson, *Afghanistan 2001-2010,* in *International Law and the Classification of Conflicts* 242, 242–43 (Elizabeth Wilmshurst, ed., 2012) (noting existence of international armed conflict in Afghanistan between the Taliban and al-Qaeda, on one side, and the United States and coalition partners, on the other, from October 2001 at least until installation of Hamid Karzai as President of Afghanistan in June 2002); Robin Geiss & Michael Siegrist, *Has the Armed Conflict in Afghanistan Affected the Rules on the Conduct of Hostilities*, 93 Int'l Rev. Red Cross 11, 13 (2011) (stating it is "widely accepted" that there was an "international armed conflict" between U.S. forces and "the Taliban governing Afghanistan, lasting from 7 October 2001 to 18 June 2002"); Gary D. Solis, *The Law of Armed Conflict: International Humanitarian Law in War* 211 (2010) (stating that U.S. invasion of Afghanistan in October 2001 initiated "an armed conflict between two state parties to the 1949 Geneva Convention, a common Article 2 international armed conflict" to which "the 1949 Geneva Conventions in their entirety" applied).[19]

Irrespective of whether the conflict in Afghanistan remained international in nature after June 2002, Mr. al-Alwi retains today the protections he enjoyed pursuant to customary international law at the time of his capture during an international armed conflict. *See* Third Geneva Convention art. 118 (stating that captives retain protections "until their final release and repatriation"). In Iraq, for example, prisoners in U.S. custody prior to the transfer of sovereignty on June 28, 2004, retained any status and protections that they enjoyed under the Geneva Conventions even after that date and the transformation of that conflict. Article 5 was crafted to

---

[19] One respected scholar of international humanitarian law goes even further, not only agreeing that the conflict was international in nature from its inception, but arguing that it remained international past the installation of Hamid Karzai and at least through the time of writing in 2011. Yoram Dinstein, *Terrorism and Afghanistan*, in International Law Studies, Vol. 85, *The War in Afghanistan: A Legal Analysis*, Michael N. Schmitt, ed., at 51 (2011).

ensure that captives like Mr. al-Alwi could not be stripped of their protections and benefits, a concern that loomed large during and after World War II. *See, e.g.*, Third Convention Commentary at 73–77.

It is important to note that there is no controlling authority that the relevant conflict in Afghanistan in connection with which Mr. al-Alwi was imprisoned became non-international in nature after June 2002. The Supreme Court specifically did not reach the question because it found that *at least* Common Article 3 of the Geneva Conventions applies, since that provision reaches both international and non-international armed conflicts, and that was enough for the Supreme Court to decide the case before it. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 628-29 (2006) ("We need not decide the merits of this argument because there is at least one provision of the Geneva Conventions that applies here even if the relevant conflict is not one between signatories.").

The court of appeals has not squarely addressed the characterization of the conflict at issue, either, and a recent concurring opinion suggests an acceptance that it is an open question. *See Al Warafi v. Obama*, 716 F.3d 627, 633 (Brown, J., concurring), *cert. denied*, 134 S. Ct. 2134 (2014) ("Because Al Warafi has failed to produce the requisite indicia of protected status, however, we need not reach the vexing questions whether Al Warafi was a member of a transnational terrorist organization or the armed forces of a High Contracting Party [...].").

In sum, no higher court has ruled that the conflict out of which Mr. al-Alwi's open-ended imprisonment arose became non-international in nature.

Finally, it bears emphasis that this Court can characterize the conflict out of which this case arose as an international armed conflict regardless of Respondents' view. *See United States v. Noriega*, 808 F. Supp. 791 (S.D. Fla. 1992) (determining over government objections that U.S.

invasion of Panama was an international armed conflict two years after that conflict was over, that the Third Geneva Convention applied, and that Manuel Noriega remained a prisoner of war); *see also Al Warafi*, 2015 WL 4600420, at *5, *7 (rejecting "proposition that it is the President and not this Court who must decide whether active hostilities exist" and holding that hostilities are ongoing).

In light of his capture in 2001, while an international armed conflict raged in Afghanistan, Mr. al-Alwi retains the protections afforded under the customary international legal norms he cites in his Petition.

## CONCLUSION

For the reasons detailed above, this Court should deny the government's motion to dismiss.

Dated: October 30, 2015

Respectfully submitted,

_____/s/_____
Ramzi Kassem
*Supervising Attorney*
Deema Azizi
Thomas Rizzuti
*Law Student Interns*
**Main Street Legal Services**
City University of New York
2 Court Square
Long Island City, NY 11101
(718) 340-4558

*Counsel for Petitioner*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**MOATH HAMZA AHMED AL-ALWI,**

    *Petitioner/Plaintiff,*

    **v.**

**BARACK H. OBAMA,** *et al,*

    *Respondents/Defendants.*

**Case No. 15-CV-681 (RJL)**

## [PROPOSED] ORDER

Upon consideration of the instant Petition for Writ of Habeas Corpus, Respondents' Motion to Dismiss, and Petitioner's Opposition to Respondents' Motion to Dismiss, it is hereby

ORDERED that the Motion to Dismiss or for Judgment is denied; and it is

FURTHER ORDERED that the Petition for Writ of Habeas Corpus is granted; and it is

FURTHER ORDERED that the government shall take all necessary and appropriate steps to facilitate Petitioner Moath al-Alwi's immediate release.

**IT IS SO ORDERED.**

Date: _____

 

                                        _____
                                        Hon. Richard J. Leon
                                        United States District Judge